_Admitted Pro Hac Vice:_
Christopher B. Major (SC Bar No. 72872)
cmajor@hsblawfirm.com
Bonnie A. Lynch (SC Bar No. 77399)
blynch@hsblawfirm.com
HAYNSWORTH SINKLER BOYD, P.A.
ONE North Main Street (29601)
P.O. Box 2048
Greenville, SC  29602
(864) 240-3200
(864) 240-3300 (facsimile)

_Local Counsel:_
William F. Murphy (CSB No: 82482)
wfm@dillinghammurphy.com
DILLINGHAM & MURPHY, LLP
601 California Street, Suite, 1900
San Francisco, CA 94108
(415) 397-2700
(415) 397-3300 (facsimile)

Attorneys for Plaintiff, Kentwool Company

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KENTWOOL COMPANY, | ) | CASE. No.: 14-CV-05264 JST |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S MEMORANDUM OF** |
| | ) | **POINTS AND AUTHORITIES IN** |
| | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **12(B)(6) MOTION TO DISMISS** |
| v. | ) | |
| | ) | |
| | ) | |
| NETSUITE, INC., | ) | Date: February 12, 2015 |
| | ) | Time: 2 p.m. |
| Defendant. | ) | Courtroom: 9 (19th Floor – SF Courthouse) |
| | ) | Judge: Hon. Jon S. Tigar |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

STATEMENT OF ISSUES...........................................................................................................1

STANDARD OF REVIEW ..........................................................................................................1

FACTUAL BACKGROUND .......................................................................................................2

ARGUMENT ...............................................................................................................................4

I.    Kentwool's Fifth, Sixth, and Eighth Causes of Action for Fraud/Misrepresentation, Negligent Misreprentation, and Fraud in the Inducement Are Sufficiently Plead and Should Not be Dismissed 4

   A.  Kentwool's Fraud-Based Claims were Plead with Particularity................................................ 4

   B. Kentwool Properly Plead, and Based, its Fraud Claims on Netsuite's False Representations, Concealment and Nondisclosure........................................................................................ 6

   C.  Kentwool Properly Plead Justifiable Reliance.......................................................................... 8

II.   Kentwool's Third and Fourth Causes of Action for Breach of the Implied Warranty of Merchantability and Fitness for a Particular Purpose Are Properly Plead and Should Not be Dismissed.............................................................................................................................9

   A.  The Essence of the Contract was for the Purchase of a "Good" Rendering the Uniform Commercial Code Applicable to Kentwool's Implied Warranty Claims ............................... 9

   B. The Contract's Warranty Disclaimer Was Ineffective Rendering Dismissal of Kentwool's Implied Warranty Claims Improper ...................................................................................... 13

   C.  Kentwool is Entitled to Plead Alternative, Inconsitent Theroies of Recovery ..................... 15

III. Kentwool Properly Plead Its First Cause of Action for Breach of Contract ................................. 16

IV. Kentwool's Second Cause of Action for Breach of Express Warranty Was Properly Plead....... 17

V.   Kentwool's Unfair Trade Practices Act Claim Is Properly Pled Under South Carolina Law.  If the Court determines that California law applies, Kentwool Seeks Leave to Amend its Complaint to Plead Violation of California's Unfair Practices Act........................................................ 17

VI.  Kentwool's Ninth Cause of Action for Rescission Was Properly Plead..................................... 18

VII. Kentwool's Tenth Cause of Action for Unjust Enrichment/Restitution Was Properly Plead ..... 18

VIII. In the Alternative, Kentwool Respectfully Requests that it be given Leave to Amend its Complaint........................................................................................................................ 18

CONCLUSION.............................................................................................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Page**

CASES

*Advent Sys.,* 925 F.2d 670 ........................................................................................ 11

*Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1474, 66 Cal. Rptr. 2d 512, 515 (1997) .................................................................................................................... 6

*Bank of Am. Nat. Trust & Sav. Ass'n v. Pendergrass*, 4 Cal. 2d 258, 48 P.2d 659 (1935) .............. 6

*Colonial Life Ins. Co. of Am. v. Elec. Data Sys. Corp.,* 817 F. Supp. 235, 239 (D.N.H. 1993) ................................................................................................................. 10, 12

*Commc'ns Groups, Inc. v. Warner Commc'ns,* 138 Misc.2d 80, 83, 527 N.Y.S.2d 341 (N.Y.Civ.Ct.1988) ................................................................................................ 11

*Crane v. Fargo,* No. CV 13-01932 KAW, 2014 WL 1285177, at *6 (N.D. Cal. Mar. 24, 2014) ...................................................................................................................... 6

*Dahlmann v. Sulcus Hosp. Tech. Corp.,* 63 F.Supp.2d 772, 775 (E.D.Mich. 1999) ................... 10

*DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir.1987) ........................................ 18

*Deerpoint Grp., Inc. v. Acqua Concepts, Inc.,* No. 1:14-CV-01503-SAB, 2014 WL 7178210, at *1 (E.D. Cal. Dec. 16, 2014) ................................................................... 1

*Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003) ........................... 18

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ................................. 18

*ePresence v. Evolve,* 190 F.Supp.2d 159 (D.Mass. 2002) ...................................................... 10

*Hamidi v. Litton Loan Serv., LP,* No. CIV S-10-0694GEBEFB, 2010 WL 3505085, at *2 (E.D. Cal. Sept. 2, 2010) ...................................................................................... 19

*Howey v. United States,* 481 F.2d 1187, 1190 (9th Cir.1973) ................................................. 18

*Langan v. United Servs. Auto. Ass'n,* No. 13-CV-04994-JST, 2014 WL 4744790, at *7 (N.D. Cal. Sept. 23, 2014) ...................................................................................... 16

*Micro Data Base Systems, Inc. v. Dharma Systems, Inc.,* 148 F.3d 649 (7th Cir.1998) ......... 10, 11

*Micro-Managers, Inc. v. Gregory,* 147 Wis.2d 500, 434 N.W.2d 97 (1988) ......................... 12, 13

*Pearl Investments, LLC v. Standard I/O, Inc.,* 257 F. Supp. 2d 326, 353 (D. Me. 2003) ............. 12

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n,* 55 Cal. 4th 1169, 1182, 291 P.3d 316, 324 (2013) ............................................................................ 6, 7

*RRX Industries, Inc. v. Lab-Con, Inc.,* 772 F.2d 543, 546 (9th Cir. 1985) ........................ 9, 10, 14

*Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*, No. 5:12-CV-04382-EJD, 2014 WL 1728705, at *2 (N.D. Cal. May 1, 2014) ..................................................1, 2, 9, 10

*Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *5 (N.D. Cal. June 5, 2009) ..........................................................................................................14

*Stenograph Corp. v. Microcat Corp.*, No. 86 C 10231, 1987 WL 13992, at *4 (N.D. Ill. Aug. 22, 1989) ..........................................................................................................13

*Svenson v. Google Inc.*, No. 13-CV-04080-BLF, 2014 WL 3962820, at *4 (N.D. Cal. Aug. 12, 2014) ......................................................................................................7, 18

*Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir.1996) ....................................19

*Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) ........................................2, 4

*Wachter Mgmt. Co. v. Dexter & Chaney, Inc.*, 282 Kan. 365, 369, 144 P.3d 747 (2006) ...........10

*Waterfront Properties v. Xerox Connect*, 58 U.C.C. Rep.Serv.2d 809, 2006 WL 266581 (W.D.N.C.2006)..........................................................................................................11

**REGULATIONS**

Fed. R. Civ. P. 8(a) ..................................................................................................1, 9

Fed. R. Civ. P. 8(d)(2) ....................................................................................................8

Fed. R. Civ. P. 8(d)(3) ....................................................................................................8

Fed. R. Civ. P. 12(b)(6) ..................................................................................................4

Fed. R. Civ. P. 9(b) ..............................................................................................2, 4, 6

Fed. R. Civ. P. 15(a)(2) ..................................................................................................18

**STATUTES**

Cal. Civ. Proc. Code § 1856(g) ........................................................................................6

Cal. Com Code §2102 ......................................................................................................9

Cal. Com Code §2105 ......................................................................................................9

Cal. Com Code § 2719 ....................................................................................................13

Cal. Com Code § 2719(1)(a) ............................................................................................13

Cal. Com Code § 2719(2) ..........................................................................................13, 14

Cal. Bus. & Prof. Code § 17200 ......................................................................................18

1

## **INTRODUCTION**

2      While Defendant relies on several theories to seek dismissal of Plaintiff's Complaint, its chief

3  and overarching strategy is to ignore Plaintiff's well-plead Complaint and, instead, assert that the

4  Complaint should be dismissed because Defendant's boilerplate terms and conditions exculpate it from

5  any and all liability.  Such a position is simply untenable and does not support dismissal of Plaintiff's

6  Complaint.  Instead, Plaintiff submits that, reviewing the Complaint under the appropriate Rule 8

7  standard, the Complaint was properly plead and, therefore, Defendant's Motion to Dismiss should be

8  denied.

9

## **STATEMENT OF ISSUES**

10      The issues before this Court are whether Plaintiff properly plead the following causes of action

11  in its Complaint: (1) Breach of Contract, (2) Breach of Express Warranty, (3) Breach of Implied

12  Warranty of Merchantability, (4) Breach of Implied Warranty of Fitness for a Particular Purpose, (5)

13  Fraud/Misrepresentation, (6) Negligent Misrepresentation, (7) Violation of Unfair Trade Practices Act,

14  (8) Fraud in the Inducement, (9) Rescission, and (10) Unjust Enrichment/Restitution.

15

## **STANDARD OF REVIEW**

16      "Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient

17  specificity to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it

18  rests.'" Simulados Software, Ltd. v. Photon Infotech Private, Ltd., No. 5:12-CV-04382-EJD, 2014 WL

19  1728705, at *2 (N.D. Cal. May 1, 2014) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555,

20  127 S.Ct. 1955 (2007)). "'[T]he pleading standard Rule 8 announces ***does not require detailed factual***

21  ***allegations***, but it demands more than an unadorned, the-defendant-unlawfully harmed-me

22  accusation.'" Deerpoint Grp., Inc. v. Acqua Concepts, Inc., No. 1:14-CV-01503-SAB, 2014 WL

23  7178210, at *1 (E.D. Cal. Dec. 16, 2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937

24  (2009)) (emphasis added).  "In assessing the sufficiency of a complaint, all well-pleaded factual

25  allegations must be accepted as true." Deerpoint, 2014 WL 7178210, at *1 (citing Iqbal, 556 U.S. at

26  67879).  "The court must also construe the alleged facts in the light most favorable to the plaintiff."

27

28

1  Simulados Software, 2014 WL 1728705, at *2 (citing Love v. United States, 915 F.2d 1242, 1245 (9th

2  Cir.1989)).

3        "In alleging fraud or mistake, a party must state with particularity the circumstances

4  constituting fraud or mistake." Rule 9(b), Fed. R. Civ. P.  "'To comply with Rule 9(b), allegations of

5  fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to

6  constitute the fraud charged so that they can defend against the charge and not just deny that they have

7  done anything wrong.'" Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (quoting Bly–Magee

8  v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)).  "In other words, these claims must generally

9  contain more specific facts than is necessary to support other causes of action." Simulados Software,

10  2014 WL 1728705, at *2.

11  **FACTUAL BACKGROUND**

12        Plaintiff, Kentwool Company ("Kentwool"), is a textile manufacturer which "operates a state-

13  of-the-art wool-based yarn spinning plant" in South Carolina.  (Compl. ¶ 7, [Dkt. No. 1-1].)  Defendant,

14  NetSuite, Inc. ("NetSuite"), is a software company engaged in the business of selling and installing

15  what it claims as the "leading integrated web-based business software suite" ("Software"). Id. at ¶ 8.

16        On or about March 14, 2013, NetSuite and Kentwool entered into NetSuite's Subscription

17  Services Agreement ("SSA")[1] for the sale and installation of the Software.  Id. at ¶ 10.  Prior to entering

18  

---

19  [1]    The written contract between the parties spans multiple documents.  The principle

20  documents consist of the SSA and its two (2) exhibits (Exhibit A – Estimate/Order Form and
Exhibit B – Professional Services Addendum), the "Terms of Service for NetSuite Applications"

21  which is incorporated by reference into the SSA, and the "Statement of Work" which is
incorporated by reference into "Exhibit B – Professional Services Addendum."  The contract also

22  includes multiple documents incorporated by reference into the above-described documents such
as "Help Documentation," the "Service Level Commitment," and "User Guides." ("Terms of

23  Service for NetSuite Applications," ¶¶ 2.7, 3.1 & 9, Ex. B to NetSuite's Request for Judicial
Notice ("RJN"), [Dkt. Nos. 35-2 – 35.3].)  Many of these documents were never provided to

24  Kentwool, particularly the "Help Documentation."  For the purposes of briefing NetSuite's
Motion to Dismiss and for ease of reference, Kentwool will refer to the many documents

25  comprising the written contract between Kentwool and NetSuite as "Contract," and will
specifically reference the individual document part of the Contract where possible.  By referring

26  to the written contract between the parties as the "Contract," Kentwool does not concede that the

27  Contract is valid or enforceable.  (See Compl. ¶¶ 75-90.)

28

into the SSA, NetSuite represented the capability of the Software and NetSuite's experience in implementing the Software in similar manufacturing environments. Id. at ¶ 12. Relying on those representations, Kentwool entered into the SSA. Id. at ¶ 13. While representing to Kentwool that it had experience in the manufacturing industry, Kentwool discovered at a NetSuite training conference that NetSuite had, in fact, never implemented its Software in the manufacturing industry. Id. at ¶ 16. Evidencing NetSuite's complete lack of experience, NetSuite's implementation of the Software was riddled with numerous and substantial problems such that complete implementation was never achieved, and Kentwool was never actually able to use the Software in its operations. Id. at ¶ 17. Despite the numerous problems, NetSuite continued to represent to Kentwool that it could correct the failures. Id. at ¶ 18. Yet, NetSuite's project manager admitted to Kentwool that he expressed doubt to his colleagues that NetSuite could deliver on the promises made to Kentwool. Id. at ¶ 14.

Still without functional Software and two (2) months *after* NetSuite was to complete implementation, Kentwool demanded adequate assurances that NetSuite would deliver a functional Software product per the terms of the Contract. Id. at ¶¶ 15 & 20. Instead of providing adequate assurances, NetSuite provided a revised Statement of Work with a proposed additional cost to Kentwool of $215,912.00, and an additional seven (7) month implementation period. Id. at ¶¶ 15 & 21. The new implementation deadline extended well beyond the original one year term of the parties' Contract. Id. at ¶ 21.

Without a functional product or any assurance from NetSuite that it could deliver its Software within the Contract's requirements, Kentwool terminated the Contract and demanded reimbursement from NetSuite. Id. at ¶ 22. NetSuite refused to reimburse Kentwool despite its complete failure to deliver its end of the bargain – functional Software. Id. at ¶ 25. Consequently, Kentwool instituted this action and asserts causes of action for (1) Breach of Contract, (2) Breach of Express Warranty, (3) Breach of Implied Warranty of Merchantability, (4) Breach of Implied Warranty of Fitness for a Particular Purpose, (5) Fraud/Misrepresentation, (6) Negligent Misrepresentation, (7) Violation of Unfair Trade Practices Act, (8) Fraud in the Inducement, (9) Rescission, and (10) Unjust Enrichment/Restitution.

1

## ARGUMENT

2

**I.**   **Kentwool's Fifth, Sixth, and Eighth Causes of Action for Fraud/Misrepresentation, Negligent Misrepresentation, and Fraud in the Inducement Are Sufficiently Plead and Should Not be Dismissed.**

3

4

5

   **A.**   **Kentwool's Fraud-Based Claims were Plead with Particularity.**

6

   In its Motion,[2] NetSuite contends that Kentwool failed to plead its fraud claims with

7

sufficient particularity, but does so without addressing or even acknowledging Kentwool's

8

specific allegations of fraud.  Kentwool's Complaint sufficiently alleged fraud and more than

9

satisfied the pleading requirements of Rule 9(b), Fed. R. Civ. P.

10

   To sufficiently plead its fraud-based claims Kentwool's allegations "must be specific enough to

11

*give . . . [NetSuite] notice of the particular misconduct which is alleged to constitute the fraud*

12

charged so  . . . [it] can defend against the charge and not just deny that . . . [it has] done anything

13

wrong." Swartz, 476 F.3d at 764 (quoting Bly–Magee, 236 F.3d at 1019) (emphasis added).

14

Kentwool's allegations do just that. To contend otherwise by ignoring key allegations of Kentwool's

15

Complaint is, in the words of NetSuite, "[d]emonstrating its desire to obfuscate and avoid providing . . .

16

the Court with the specifics to which . . . [it is] entitled . . . ." (Motion, p. 15, [Dkt. No. 34]).

17

   NetSuite fails to address, or even acknowledge, the following key allegations establishing

18

Kentwool's fraud-based claims:

19

      12.   Prior to contracting with NetSuite, KENTWOOL met with
NetSuite on multiple occasions to discuss KENTWOOL's needs and the

20

Software's ability to meet those needs.  Prior to entering into the Agreement,
NetSuite represented to KENTWOOL on numerous occasions that it had

21

experience in the manufacturing industry, and that the Software was fully capable
of integrating the management of KENTWOOL's manufacturing, inventory,

22

purchasing, financial, sales, and shipping processes, specifically including
providing visibility and management of all products, including its blended

23

products, through KENTWOOL's manufacturing process.  More specifically,
NetSuite represented to KENTWOOL that "NetSuite is a complete solution for

24

*manufacturing organizations* that require inventory management with dynamic

25

replenishment, production planning, warehouse management, financial

26

[2]   "Motion" refers, herein, to NetSuite's Notice of Motion and Motion to Dismiss Plaintiff
Kentwool Company's Complaint Pursuant to Federal Rule of Civil Procedure Section 12(b)(6);

27

Memorandum of Points and Authorities in Support Thereof, [Dkt. No. 34].

28

accounting and costing, customer and partner relationship management, and ecommerce." (emphasis added). NetSuite further represented to KENTWOOL that the Software functionality would include, among others, advanced financials, item management, production planning, manufacturing control, cost control, lot and serial control, multi-division/multi-site solutions, and order management.

\*        \*        \*

14.    Upon information and belief, at the time NetSuite was representing to KENTWOOL that the Software could integrate the management of KENTWOOL's manufacturing, inventory, purchasing, financial, sales and shipping processes into a single platform, NetSuite knew that, in fact, the Software lacked the functionality to perform as represented. During a discussion regarding the problems with the implementation process, Rob Gallagher, the NetSuite project manager for the KENTWOOL implementation, informed KENTWOOL that after an early sales meeting in which NetSuite represented the Software's supposed "capabilities" to KENTWOOL in an effort to induce KENTWOOL to choose NetSuite's Software, he expressed doubt to his colleagues that NetSuite could deliver on the promises made to KENTWOOL.

\*        \*        \*

18.    NetSuite made continued assurances to KENTWOOL that it could correct the failures in the Software and complete the implementation process. Relying on those assurances, KENTWOOL continued to pay for consulting services and technical support from NetSuite to address the deficiencies. Ultimately, KENTWOOL paid NetSuite $317,851.26, which was well in excess of the original estimate of $245,784.65 provided to KENTWOOL.

\*        \*        \*

44.    Prior to KENTWOOL entering into the Agreement with NetSuite, NetSuite represented to KENTWOOL that the Software would integrate the management of KENTWOOL's manufacturing, inventory, purchasing, financial, sales and shipping processes, specifically including providing visibility and management of blended products through the manufacturing process. NetSuite further represented to KENTWOOL that the Software functionality would include, among others, advanced financials, item management, production planning, manufacturing control, cost control, lot and serial control, multi-division/multi-site solutions, and order management.

45.    During the implementation process NetSuite represented to KENTWOOL that it would, and did, correct the problems experienced by Plaintiff so that the Software would perform as originally represented to KENTWOOL. Despite NetSuite's representations, the Software continued to malfunction. NetSuite's assurances repeatedly obfuscated the true nature of the problems endemic to its Software program, and NetSuite used its technical knowledge to explain away problems and defects in the Software as typical difficulties in the cutover.

(Compl. ¶¶ 12, 14, 18 & 44-45; see also Compl. ¶¶ 56-57, 76.) The foregoing allegations state with specificity the nature of the misrepresentations, when the misrepresentations were made,

and the parties to the misrepresentations.  Kentwool has met its obligation to provide NetSuite notice of the particular circumstances of misconduct such that NetSuite can defend against the charge.  It is only by ignoring these specific allegations, as NetSuite does in its Motion, that one could argue that the requirements of Rule 9(b) are somehow not met.

**B.     Kentwool Properly Plead, and Based, its Fraud Claims on NetSuite's False Representations, Concealment and Nondisclosure.**

To properly plead a fraud claim under California law, Kentwool is required to plead, among other elements, a misrepresentation.  Anderson v. Deloitte & Touche, 56 Cal. App. 4th 1468, 1474, 66 Cal. Rptr. 2d 512, 515 (1997).  A misrepresentation sufficient to support a fraud claim may consist of a false representation, concealment or nondisclosure.  Id.  Here, Kentwool specifically alleged that NetSuite made numerous false representations about the capabilities of the Software and NetSuite's ability to timely and properly implement the Software.  (Compl. ¶¶ 12, 14, 18, 44-45, 56-57, & 76.) NetSuite now essentially contends that its misrepresentations are insufficient to sustain a fraud claim because of the mere presence of an integrated contract between the parties.

Kentwool principally relies on the parol evidence rule and the proposition stated in Crane v. Fargo, "that a fraud claim may not consist of promises that ***run counter*** to the written contract."  Crane v. Fargo, No. CV 13-01932 KAW, 2014 WL 1285177, at *6 (N.D. Cal. Mar. 24, 2014) (emphasis added).  However, while the parol evidence rule precludes reliance on extrinsic evidence to alter or add terms to a fully integrated writing, it also *explicitly permits* the use of extrinsic evidence to prove fraud as follows:

> This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud.

Cal. Civ. Proc. Code § 1856(g).  The California Supreme Court acknowledged as much when it overruled Bank of Am. Nat. Trust & Sav. Ass'n v. Pendergrass, 4 Cal. 2d 258, 48 P.2d 659 (1935) which held, in part, that in order to invoke the fraud exception, the promise at issue cannot be directly at variance with the promise of a writing.  Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit

1    Ass'n, 55 Cal. 4th 1169, 1182, 291 P.3d 316, 324 (2013).  The California Supreme Court re-affirmed

2    the long standing rule that "'*[p]arol evidence is always admissible to prove fraud, and it was never*

3    *intended that the parol evidence rule should be used as a shield to prevent the proof of fraud*.'"

4    Riverisland, 55 Cal. 4th at 1180-81, 291 P.3d at 323 (quoting Ferguson v. Koch, 204 Cal. 342, 347, 268

5    P. 342 (1928)) (emphasis added). NetSuite provides no authority for its argument that a party is free to

6    make misrepresentations to induce a party to enter a contract as long as an integration clause is included

7    in the boilerplate terms and conditions drafted by the defrauding party.  Such a position would clearly

8    violate the duty of good faith and fair dealing underlying every contract.  See Svenson v. Google Inc.,

9    No. 13-CV-04080-BLF, 2014 WL 3962820, at *4 (N.D. Cal. Aug. 12, 2014) ("The implied promise of

10   good faith and fair dealing requires each contracting party to refrain from doing anything to injure the

11   right of the other to receive the benefits of the agreement.")

12           Even assuming that Kentwool could somehow be precluded from relying on extrinsic

13   evidence to prove its fraud claim, NetSuite failed to identify what provisions of the Contract "run

14   counter" to the promises made by NetSuite.  In fact, the Contract is consistent with NetSuite's

15   alleged misrepresentations as to its experience and functionality of the Software.  As it relates to

16   NetSuite's experience, NetSuite specifically warranted its experience in the Contract as follows:

17
             NetSuite warrants that (a) it and each of its employees . . . has the necessary
18           knowledge, skills, experience, qualifications, and resources to provide and
             perform the services in accordance with this SOW; and (b) the Professional
19           Services will be performed for and delivered to Customer in a good, diligent,
             workmanlike manner in accordance with industry standards, laws and
20           governmental regulations applicable to the performance of such services.

21   ("Professional Services Addendum," ¶ 4.1, Ex. A to RJN, [Dkt. No. 35-2].)  As it relates to the

22   functionality of the system, NetSuite represented that it would provide a functional system as

23   described in the Estimate/Order Form.[3]  NetSuite's assertion that dismissal of Kentwool's fraud-

24   _____

25   [3]      The "Terms of Service for NetSuite Applications" warranted that the Software would
     function as described in the Help Documentation applicable to the Service.  ("Terms of Service
26   for NetSuite Applications," ¶ 3.1, Ex. B to RJN, [Dkt. No. 35-3].)  "Service" is defined, in part,
     as those products and services "procured by Customer from NetSuite in the Estimate/Order Form
27   . . . ."  Id. at ¶ 9.

28                                                                                        7
                     Plaintiff's Memorandum in Opposition to Defendant's 12(b)(6) Motion to Dismiss
                     14-CV-05264 JST

1  based claims is warranted based on the mere presence of a fully integrated contract with

2  warranty disclaimers, is itself contrary to the clear warranties that were provided and violated by

3  NetSuite in the same contractual documents containing the integration clauses.

4  Notwithstanding the foregoing, Rule 8(d)(2) – (3), Fed. R. Civ. P., authorizes a party to plead in

5  the alternative and assert inconsistent claims. Specifically, Rule 8(d)(3) provides that "[a] party may

6  state as many separate claims or defenses as it has, regardless of consistency." Rule 8(d)(3), Fed. R.

7  Civ. P. Here, the premise of NetSuite's argument is the validity of the Contract and, concomitantly, the

8  effectiveness of the warranty disclaimer. However, Kentwool takes the position, and has properly

9  plead, that the Contract is void rendering NetSuite's warranty disclaimers ineffective. (Compl. ¶¶ 75-

10  90.) Presuming that Kentwool could not sustain its fraud claims due to the disclaimers in the Contract

11  (which Kentwool vehemently disputes), Kentwool is, nevertheless, entitled to plead alternative,

12  inconsistent theories of recovery. As such, NetSuite's Motion to Dismiss on this ground fails.

13  **C.    Kentwool Properly Plead Justifiable Reliance.**

14  In each of its fraud-based claims Kentwool plead justified reliance as follows:

15  51.    Based on NetSuite's superior knowledge of its Software and its ability to

16  customize, configure and implement the Software for KENTWOOL's specific needs and uses, KENTWOOL, who had no actual knowledge of the Software's

17  capabilities, justifiably relied upon NetSuite's representations by entering into the Agreement and continuing the relationship with NetSuite.

18

19  (Compl. ¶¶ 51; see also Compl. ¶¶ 65 & 82). NetSuite once again argues that those allegations

20  should be disregarded due to the Contract's integration provisions. As addressed at length above

21  in section I.B., and incorporated herein by reference, the Contract was consistent with NetSuite's

22  representations that the Software would be functional and that NetSuite's representatives would

23  provide professional services in implementing the Software. Furthermore, under Rule 8(d)(2),

24  Kentwool is entitled to plead in the alternative. As a result, NetSuite's argument, which is

25  conditioned upon this Court finding the Contract valid and enforceable, is ineffective to obtain

26  dismissal of Kentwool's fraud-based claims.

27

28

## II. Kentwool's Third and Fourth Causes of Action for Breach of the Implied Warranty of Merchantability and Fitness for a Particular Purpose Are Properly Plead and Should Not be Dismissed.

### A. The Essence of the Contract was for the Purchase of a "Good" Rendering the Uniform Commercial Code Applicable to Kentwool's Implied Warranty Claims.

Kentwool properly plead that NetSuite sold Kentwool a "good" in South Carolina thereby meeting Kentwool's pleading requirement under Rule 8(a), Fed. R. Civ. P.   (Compl. ¶ 4.) Nevertheless, NetSuite contends otherwise and asserts that Kentwool's implied warranty claims should be dismissed because the Contract was for the provision of services and not for the sale of goods. However, viewing the Contract as a whole, and considering the amount of money allocated to Kentwool's purchase of the Software versus the amount allocated to NetSuite's implementation of the Software, the essence of the agreement was one for the sale of a "good" as defined by the Uniform Commercial Code ("UCC").  NetSuite's argument to the contrary is without authority and insufficient to grant dismissal of Kentwool's implied warranty claims.

The UCC applies to "transactions in goods." Cal. Com Code §2102.  "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ."  Id. at §2105.  "The primary test used by courts to determine whether software is a good under the UCC is the predominate factor test, where courts look to the 'essence of the agreement' on a case-by-case basis to decide how to characterize the transaction."  Simulados Software, 2014 WL 1728705, at *5 (quoting Gross v. Symantec Corp., No. C–12–00154–CRB, 2012 WL 3116158, at *8 (N.D.Cal. July 31, 2012)).  "Courts determine whether the predominant factor or purpose of the contract is rendition of services, with goods incidentally involved, or is rendition of goods, with labor incidentally involved."  Simulados Software, 2014 WL 1728705, at *5.  "When a sale predominates, incidental services provided do not alter the basic transaction."  RRX Industries, Inc. v. Lab-Con, Inc., 772 F.2d 543, 546 (9th Cir. 1985).

In RRX Industries, Inc. v. Lab-Con, Inc., the Ninth Circuit found that a license for software for use in medical laboratories was covered by the UCC, even when the software contract also provided for ancillary services such as training, repair, and system upgrading.   The court noted, "[h]ere, the sales

1    aspect of the transaction predominates. The employee training, repair services, and system upgrading

2    were incidental to sale of the software package and did not defeat characterization of the system as a

3    good." Id. at 546.  Similarly, in Colonial Life Ins. Co. of Am. v. Elec. Data Sys. Corp., the court found

4    that even where the defendant software developer was to spend four years developing and customizing

5    its software for plaintiff, the contract was still governed by the UCC because "*the purpose or thrust of .*

6    *. . [the] services was support of . . . [defendant's] product, the Insurance Machine, in*

7    *accommodating . . . [plaintiff's] business practices.  The essence of the contract was to license . . .*

8    *[plaintiff] to use a computer software product*."   Colonial Life Ins. Co. of Am. v. Elec. Data Sys.

9    Corp., 817 F. Supp. 235, 239 (D.N.H. 1993) (emphasis added).

10       As acknowledged in Simulados Software, "[s]oftware may still be considered a good even

11   when accompanied by ancillary services, which 'are not substantially different from those generally

12   accompanying package sales of computer systems consisting of hardware and software.' . . .  Such

13   ancillary services include installation, training, and technical support." Simulados Software, 2014 WL

14   1728705, at *6 (citing references omitted).  See Dahlmann v. Sulcus Hosp. Tech. Corp., 63 F.Supp.2d

15   772, 775 (E.D.Mich. 1999) (a contract for property management systems incorporating hardware,

16   software, installation, training, and technical support services for plaintiffs' hotels was a contract for

17   goods because the provisions for services were incidental to the agreements for the system); ePresence

18   v. Evolve, 190 F.Supp.2d 159 (D.Mass. 2002) (a contract for software licensing which also included

19   services was determined to be a transaction for goods, as the software programs themselves were the

20   essence of the parties' agreement); Wachter Mgmt. Co. v. Dexter & Chaney, Inc., 282 Kan. 365, 369,

21   144 P.3d 747 (2006) (even when incidental services such as modifications, corrections, maintenance,

22   training, and consulting were provided with software, the services would have been unnecessary if the

23   software had not been purchased, so the transaction is predominantly for a good).

24       As acknowledged by the Simulados Court, "*[e]ven software adapted for specific needs*

25   *has been considered a good*."  Simulados, 2014 WL 1728705 at *6 (emphasis added).

26       In Micro Data Base Systems, Inc. v. Dharma Systems, Inc., 148 F.3d 649 (7th
     Cir.1998), the Seventh Circuit determined that the UCC governed a contract for

27   software where one party agreed to adapt its software program for use in the other

28

party's system. The court noted that 'labor is a service' that is part of the manufacture of every good and opined, 'we can think of no reason why the UCC is not suitable to govern disputes arising from the sale of custom software.' Id. 654–55. Similarly, the Third Circuit found that the software contracted for was a good where one party planned to modify its existing software and hardware interfaces for the other party's use. Advent Sys., 925 F.2d 670. The court noted, '[t]he fact that some programs may be tailored for specific purposes need not alter their status as goods because the Code definition includes specially manufactured goods.' Id. at 675. The Third Circuit found that the advantages of applying the UCC to software transactions (namely uniformity on a range of questions) and the importance of software to the commercial world were strong policy arguments favoring the application of the UCC and that the majority of academic commentary espoused the view that software falls under the UCC. Id. at 675–76. See also Commc'ns Groups, Inc. v. Warner Commc'ns, 138 Misc.2d 80, 83, 527 N.Y.S.2d 341 (N.Y.Civ.Ct.1988) (determining that a contract which provided for the installation of specially designed software equipment for one party's telephone and computer systems, including recording, accounting and traffic analysis and optimizations, modules, buffer, directories and an operational user guide was a transaction of software equipment involving movable, tangible and identifiable products or goods); Waterfront Properties v. Xerox Connect, 58 U.C.C. Rep.Serv.2d 809, 2006 WL 266581 (W.D.N.C.2006) (agreements for the provision of custom adapted pre-existing computer software and attendant hardware were contracts predominately for goods, which are governed by the UCC).

Id. Here, a review of the parties' Contract reveals that the main thrust of the transaction was Kentwool's purchase of the Software. NetSuite's implementation and customization services associated with Kentwool's use of the Software were merely incidental to the overall thrust of the Contract, namely – NetSuite's sale and Kentwool's purchase and use of the Software to manage its business applications.

The Estimate/Order Form, which set forth the goods and services sold,[4] specifically identified the already existing NetSuite software and accompanying "modules" that would be installed on Kentwool's system. Specifically, the following pieces of software were sold to Kentwool: "NetSuite Manufacturers Mid Market Edition," "OneWorld Module – Mid Market Edition," "Incentive Compensation Module – Mid Market Edition," "Module - Demand Planning – Mid Market Edition,"

---

[4] "The Service shall be ordered by Customer . . . pursuant to Estimates/Order Forms. Each Estimate/Order Form . . . shall include at a minimum a listing of the Service and any NetSuite implementation services being ordered and the fees therefore." (SSA, ¶ 2, Ex. A to RJN, [Dkt. No. 35].)

1  "Advanced Financials Module – Mid Market Edition," "Advanced Projects – Mid Market Edition,"

2  "Fixed Asset Management Module – Mid Market Edition," "NetSuite Retail Anywhere Module – Mid

3  Market Edition," "NetSuite Retail Anywhere-Retail Location(s) Access – MidMarket."

4  (Estimate/Order Form, pp. 1-2, Ex. A to RJN, [Dkt. Nos. 35-1 - 35-2].)

5         Notably, each of the foregoing pieces of existing software were individually priced in the

6  Estimate/Order Form and were, concomitantly, individually sold to Kentwool.  Id.  The Software was

7  not custom designed by NetSuite from the ground up for Kentwool.  Pearl Investments, LLC v.

8  Standard I/O, Inc., 257 F. Supp. 2d 326, 353 (D. Me. 2003) (noting courts' application of the UCC

9  where programmers "sold preexisting software (albeit with custom modifications or upgrades to adapt

10  it to the user's needs or equipment) and were paid in a manner primarily reflecting sale of goods . . ."

11  and courts' refusal to apply the UCC where creation of the software was from "scratch (concept to

12  realization) for which . . . [the programmer] would be paid on a time and materials basis.")  Therefore,

13  much like the situation in above-cited cases, the thrust of the Contract was for the sale of NetSuite's

14  software and "the purpose or thrust of . . . [NetSuite's] services was support of . . . [its] product . . . in

15  accommodating . . . [Kentwool's] business practices.  The essence of the contract was to license . . .

16  [Kentwool] to use a computer software product."  Colonial Life Ins. Co. of Am., 817 F. Supp. at 239

17  (emphasis added).

18         Furthermore, the Estimate/Order Form also identified the Software and NetSuite's

19  implementation services by separate line items and sections.  ("Estimate/Order Form," pp. 1-3, Ex. A to

20  RJN, [Dkt. Nos. 35-1 – 35-2].)  The "LICENSE AND SUPPORT" identified the Software to be

21  provided  (i.e. NetSuite Manufacturers Mid Market Edition), while the "PROFESSIONAL

22  SERVICES" was a separate line item.  Id.  Telling is that of the $245,784.65 estimate, only $81,120.00,

23  or roughly 33%, of the estimate was devoted to NetSuite's implementation services.  Since a mere 33%

24  of the parties' transaction concerned NetSuite's services, they are by very definition incidental to the

25  Software sold to Kentwool.

26         A similar analysis was used in Micro-Managers, Inc. v. Gregory, 147 Wis.2d 500, 434 N.W.2d

27  97 (1988) to find that a custom designed software transaction was one predominantly for the sale of

28                                                                                                      12

services.  In reaching its decision, the court relied on the fact that the total cost was $59,828 and, of that sum, $55,968 was for labor and support.  Id. at 508, 434 N.W.2d at 100; see also Stenograph Corp. v. Microcorp., No. 86 C 10231, 1987 WL 13992, at *4 (N.D. Ill. Aug. 22, 1989) (finding that the UCC applied to the sale of the assets and liabilities of a corporation where the parties allocated $950,000 of the total $1,000,000 purchase price to the corporation's software and only $50,000 to the corporation's copyrights, trademarks and other intangible assets.)

Furthermore, and without citation to any authority whatsoever, NetSuite implies that Kentwool's implied warranty claims should be dismissed on the assertion that Kentwool should have, but did not, cite to the UCC. Nowhere does NetSuite cite to any authority justifying dismissal of Kentwool's implied warranty claims on that basis, nor should it be a basis on which Kentwool's implied warranty claims are dismissed.

## B. The Contract's Warranty Disclaimer Was Ineffective Rendering Dismissal of Kentwool's Implied Warranty Claims Improper.

The Contract contains multiple warranty disclaimers on which NetSuite relies to seek dismissal of Kentwool's implied warranty claims.  Under California law, these disclaimers are void and are, therefore, ineffective to disclaim the implied warranties at issue given NetSuite's fundamental failure to deliver a functional product to Kentwool.

California Commercial Code § 2719(1)(a) provides that an agreement "may limit or alter the measure of damages recoverable under this division, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts . . . ."  However, "*[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code*."  Cal. Com Code § 2719(2) (emphasis added).  The California Code Comment to § 2719 explains that "Subdivision (2) provides that where the remedy provided by the agreement '*fails of its essential purpose or operates to deprive either party of the substantial value of the bargain', it will not be enforced*. In this case, the remedies provided in the Commercial Code govern as if the parties had not agreed to any remedy of their own." (emphasis added).

1    "'A limited remedy fails of its essential purpose when the circumstances existing at the

2    time of the agreement have changed so that enforcement of the limited remedy would essentially

3    leave plaintiff *with no remedy at all*.'"   Stearns v. Select Comfort Retail Corp., No. 08-2746 JF,

4    2009 WL 1635931, at *5 (N.D. Cal. June 5, 2009) (quoting Computerized Radiological Servs.,

5    Inc. v. Syntex Corp., 595 F.Supp. 1495, 1510 (E.D.N.Y. 1984), aff'd in part and rev'd in part

6    (2nd Cir. 1986) 786 F.2d 72) (emphasis added by Stearns opinion). "This theory is often raised

7    where a buyer seeks a refund or rescission of the original agreement, but the seller insists that

8    repair is the only available remedy."   Stearns, 2009 WL 1635931 at *5 (citing Gavaldon v.

9    DaimlerChrysler Corp., 32 Cal.4th 1246, 1259-65 (2004)).

10       In RRX Industries v. Lab-Com Inc., the Ninth Circuit Court of Appeals affirmed the lower

11   court's decision awarding consequential damages to the buyer of a computer software system, despite a

12   term in the agreement limiting the buyer's recovery to the amount paid.  The parties' agreement

13   required the seller to timely install an operational software system, to repair malfunctions, and to train

14   the buyer's employees.  The record reflected that the software never functioned as intended, and the

15   seller failed to correct adequately programming errors, and did not provide the buyer's employees with

16   sufficient training.  The District Court determined that the sellers were either "unwilling or unable to

17   provide a system that worked as represented, or to fix the 'bugs' in the software" and that the default of

18   the sellers was so total and fundamental that its consequential damages limitation was expunged from

19   the contract."   Id. at 547.   "Neither bad faith nor procedural unconscionability is necessary under

20   California Commercial Code § 2719(2).  It provides an independent limit when circumstances render a

21   damages limitation clause oppressive and invalid."   Id.

22       Here, the limited warranty provided by NetSuite failed of its essential purpose, leaving

23   Kentwool with no remedy at all.  As noted by NetSuite, the Contract contains multiple provisions

24   purportedly disclaiming both express and implied warranties of all kinds and providing, as the sole and

25   exclusive warranty, a "Warranty of Functionality." The "Warranty of Functionality" warrants that "(i)

26   the Service will achieve in all material respects the functionality described in the Help Documentation

27   applicable to the Service procured by Customer, and (ii) such functionality of the Service will not be

28

materially decreased during the Term." ("Terms of Service for NetSuite Applications," ¶ 3.1, Ex. B to RJN, [Dkt. No. 35-3].)   Kentwool's purported "sole and exclusive remedy" for NetSuite's breach thereof was repair by NetSuite or, if NetSuite was unable to restore functionality, for a pro-rata refund of the subscription fees for the remainder of the Contract term.  Id.

Here, and as alleged by Kentwool, the Software failed to operate as represented by NetSuite and NetSuite was unable to correct the deficiencies.  (Compl. ¶¶ 17-21.)  Indeed, when asked for assurances that it would make the software functional, NetSuite refused, and instead sought to discreetly extend the term of the parties Contract for a number of months and to extract another $215,912.00 from Kentwool while refusing to provide any assurances that NetSuite's efforts would be successful.  Id. at ¶¶ 20 – 21.

Under the "Warranty of Functionality," and because NetSuite was unable to remedy the deficiencies in the Software, Kentwool's recovery would be limited to a refund of the remaining term of the Contract – approximately two (2) months equating to $40,964.11.[5]  However, due to NetSuite's initial inability to provide the bargained for Software, Kentwool paid NetSuite an additional $72,066.61 over and above the $245,784.65 estimate.  Id. ¶ 18.   In sum, Kentwool paid NetSuite a total of $317,851.26.  Id. ¶ 18.  Thus, if NetSuite was permitted to follow the "Warranty of Functionality" out to its conclusion, Kentwool would be limited in its recovery to $40,964.11 although it spent $317,851.26 and received nothing in return.   Considering that Kentwool's net loss would be $276,887.15, over $30,000 *more* than the Estimate/Order Form, the limited warranty, without question, fails of its essential purpose and, if enforced, would leave Kentwool with no remedy whatsoever.

## C.     Kentwool is Entitled to Plead Alternative, Inconsistent Theories of Recovery.

Similar to its arguments for the dismissal of Kentwool's fraud-based claims, NetSuite's arguments for the dismissal of Kentwool's implied warranty claims rest on the assumption that the Contract is valid and enforceable.  As plead in the Complaint, Kentwool disputes that the

---

[5]     The term of the Agreement was from March 18, 2013 to March 17, 2014.  (Compl. ¶ 11.) Kentwool provided notice of termination on January 16, 2014, leaving approximately two (2) months in the term.

1    Contract is enforceable.    (Compl. ¶¶ 75-90.)    As noted above in section I.B., which is

2    incorporated herein by reference, Kentwool is entitled to plead in the alternative. As such,

3    NetSuite's argument, which turns on the enforceability of the Contract and the warranty

4    disclaimers, is insufficient to support dismissal of Kentwool's implied warranty claims.

5    **III.    Kentwool Properly Plead Its First Cause of Action for Breach of Contract.**

6        NetSuite's contention that Kentwool failed to properly plead its performance under the

7    Contract is without merit.   Kentwool *specifically plead* that it complied with the obligations of

8    the Contract as follows:

9        28.    In  return  for  the  purchase,  customization,  configuration  and
         implementation of the ERP Software, KENTWOOL paid NetSuite $317,851.26,
10       ***satisfying its obligations under the Agreement***.

11   (Compl. ¶ 28) (emphasis added).

12       NetSuite also asserts that Kentwool's Breach of Contract claim should be dismissed for failure

13   to plead the terms of the Contract.  All that is required to state a claim for Breach of Contract under

14   California law is for Kentwool to allege "'the existence of the contract, performance by or excuse for

15   nonperformance by the plaintiff, breach by the defendant, and damages.'" Langan v. United Servs.

16   Auto. Ass'n, No. 13-CV-04994-JST, 2014 WL 4744790, at *7 (N.D. Cal. Sept. 23, 2014) (quoting First

17   Comm'l Mortg. Co. v. Reece, 89 Cal.App.4th 731, 745 (2001)).  "While it is unnecessary for a plaintiff

18   to allege the terms of the alleged contract with precision,  . . . the Court must be able generally to

19   discern at least what material obligation of the contract the defendant allegedly breached." Langan,

20   2014 WL 4744790 at *7 (citing reference omitted).  Kentwool did just that.  Specifically, Kentwool

21   alleged the material terms of the Contract, (Compl. ¶ 10), and NetSuite's breach thereof, (Compl. ¶ 29).

22   Nothing more is required, especially considering that the Contract spans multiple documents and the

23   Estimate/Order Form describing the services NetSuite agreed to provide Kentwool, is written in a

24   cryptic and complex manner, an example of which is shown below:

25

26

27

28                                                                          16

| Item | Qty | Description | Term Mos. | Amount |
|------|-----|-------------|-----------|--------|
| | | LICENSE AND SUPPORT | | |
| NetSuite Manufacturers Mid Market Edition | 1 | NetSuite Manufacturers Mid Market Edition, ** ERP with G/L, Accounts Payable, Purchasing, Inventory, Order Entry, A/R, Expense Reporting, ** NetSuite CRM Sales Force Automation with quote and order management, Marketing Automation with campaigns; Customer Service/Support ** Productivity tools including contacts/calendar/events ** Lot Management ** Multiple Units of Measure ** Matrix items: automatically manage multiple item options ** Serialized Inventory ** Bar Coding: items and transactions ** Pick, Pack, Ship ** Advanced Shipping with Integrated UPS or FedEx shipping ** Assemblies with management of multi-level sub-components, assembly build/unbuild, and inventory tracking of finished build vs. sub-components ** Work Orders for managing both Production Order and Special Order assembly build workflows to replenish stock levels or handle custom orders ** Work in Process tracking with work order issue and completion ** ECommerce publishing engine with integrated catalog, secure shopping cart and customer self-service ** Real-time Dashboards with key business metrics, report snapshots ** Customer Center and Partner Center logins ** 5 Employee Self-Service Users ** 30,000 integrated bulk mail merges per month ** 120,000 campaign emails per year with no single blast exceeding 10,000 recipients ** 10 GB File Cabinet and 10 GB Data storage per account ** 500 integrated Web store items ** All Oracle Database & Application Server O/S licenses | 12 | 23,988.00 |
| OneWorld Module - Mid Market Edition | 1 | NetSuite OneWorld includes ** 10 Subsidiary companies ** Multi- company / Multi-org support in single NetSuite Account ** Segregated ERP and G/L for each Subsidiary ** Global CRM and Sales Support ** Multiple transaction and consolidation currencies ** Local functional currency reporting for each Subsidiary ** Real-time consolidated financial reporting for multiple currencies ** Multi-country regulatory tax and reporting support | 12 | 23,988.00 |
| Incentive Compensation Module - Mid Market Edition | 1 | Incentive Compensation for NetSuite & NetSuite CRM+ ** Commission Schedules based on products, percentage attainment, thresholds and dates ** Commission Plans with multiple Commission Schedules ** Automated management of Special Incentives (spiffs) ** Roll Up Commissions Plans with Manager incentives ** Executive Commission Plan management ** Process and pay Commissions (U.S. version & NetSuite Payroll required) ** Alt Sales Amount (ASA) | 12 | 5,988.00 |

(Estimate/Order Form, p.1, Ex. A to RJN, [Dkt. Nos. 35-1 – 35-2].)

**IV.     Kentwool's Second Cause of Action for Breach of Express Warranty Was Properly Plead.**

NetSuite's argument for the dismissal of Kentwool's Second Cause of Action for Breach of Express Warranty is identical to its parol evidence argument regarding Kentwool's fraud based claims.  As such, Kentwool incorporates its arguments set forth above at I.B.

**V.     Kentwool's Unfair Trade Practices Act Claim Is Properly Pled Under South Carolina Law.  If the Court determines that California law applies, Kentwool Seeks Leave to Amend its Complaint to Plead Violation of California's Unfair Practices Act.**

Kentwool properly plead in the alternative that the Contract is void.  (Compl. ¶¶ 75-90.) As such, the choice of law provision negotiated as part of the promised delivery of a functional software package, would be negated and South Carolina law would apply to the facts of the case. This action was originally filed in South Carolina state court.  If the Court determines that the

1    Contract is in effect, Kentwool would request the opportunity to amend its Complaint to allege a

2    cause of action under the California Trade Practices Act.  Cal. Bus. & Prof. Code § 17200.

3    **VI.    Kentwool's Ninth Cause of Action for Rescission Was Properly Plead.**

4            Similar to its argument for the dismissal of Kentwool's fraud-based claims, NetSuite

5    contends that Kentwool's Rescission claim should be dismissed for failure to plead fraud with

6    sufficient specificity.  As such, and in response thereto, Kentwool incorporates by reference its

7    arguments set forth above at I.A through I.C.

8    **VII.   Kentwool's Tenth Cause of Action for Unjust Enrichment/Restitution Was Properly Plead.**

9            As is well established, "'a plaintiff may not plead the existence of an enforceable contract

10   and maintain a quasi-contract claim at the same time, ***unless the plaintiff has pled facts***

11   ***suggesting that the contract may be unenforceable or invalid.***'"  Svenson, 2014 WL 3962820,

12   at *4 (quoting Schulz v. Cisco Webex, LLC, No. 13–cv–04987–BLF, 2014 WL 2115168, at *5

13   (N.D.Cal. May 20, 2014)) (emphasis added).   Here, Kentwool specifically plead the

14   unenforceability and invalidity of the Contract through its Recession and Fraud in the

15   Inducement claims.    (Compl. ¶¶ 75-90.)    Consequently, Kentwool's claim for Unjust

16   Enrichment/Restitution was properly plead and should not be dismissed.

17   **VIII.  In the Alternative, Kentwool Respectfully Requests that it be given Leave to Amend
18            its Complaint.**

19           Rule 15 of the Federal Rules of Civil Procedure governs a party's ability to amend a

20   pleading.  As provided in Rule 15(a)(2), "[t]he court should freely give leave when justice so

21   requires."  Rule 15(a)(2), Fed. R. Civ. P.

22           The policy of freely granting leave to amend should be applied with "extreme
             liberality." DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir.1987).
23           When determining whether to grant leave to amend under Rule 15(a), a court
             should consider the following factors: (1) undue delay; (2) bad faith; (3) futility of
24           amendment; and (4) prejudice to the opposing party. Foman v. Davis, 371 U.S.
             178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). According to the Ninth Circuit,
25           "the crucial factor is the resulting prejudice to the opposing party," and the burden
             of showing that prejudice is on the party opposing amendment. Howey v. United
26           States, 481 F.2d 1187, 1190 (9th Cir.1973); Eminence Capital, LLC v. Aspeon,
             Inc., 316 F.3d 1048, 1052 (9th Cir.2003); DCD Programs, 833 F.2d at 187.
27           Granting or denying leave to amend rests in the sound discretion of the trial court,

28                                                                                                    18

1   and will be reversed only for abuse of discretion. <u>Swanson v. U.S. Forest Serv.</u>, 87 F.3d 339, 343 (9th Cir.1996).

2   <u>Hamidi v. Litton Loan Serv., LP</u>, No. CIV S-10-0694GEBEFB, 2010 WL 3505085, at *2 (E.D.

3   Cal. Sept. 2, 2010).

4       In the event that this Court determines that Kentwool insufficiently plead any of its

5   claims, Kentwool respectfully requests that it be given leave to amend its Complaint.  Since

6   NetSuite has not answered the Complaint, there is no prejudice to NetSuite, nor is there undue

7   delay by Kentwool in seeking leave to amend its Complaint.  Furthermore, for the reasons stated

8   herein, Kentwool's amendment would not be in bad faith or futile but would, instead, be for the

9   deficiencies noted by this Court in granting NetSuite's Motion to Dismiss.

10                              **<u>CONCLUSION</u>**

11      For all the foregoing reasons, Kentwool respectfully requests that this Court deny

12  NetSuite's Motion to Dismiss.

13  Dated:  January 20, 2015                ***<u>Admitted Pro Hac Vice</u>***:

14                                            /s/ Christopher B. Major
15                                          Christopher B. Major (SC Bar No. 31663)
                                            cmajor@hsblawfirm.com
16                                          Bonnie A. Lynch (SC Bar No. 77399)
                                            blynch@hsblawfirm.com
17                                          HAYNSWORTH SINKLER BOYD, P.A.
                                            ONE North Main Street (29601)
18                                          P.O. Box 2048
                                            Greenville, SC  29602
19                                          (864) 240-3200
                                            (864) 240-3300 (facsimile)

20                                          ***<u>Local Counsel</u>***:

21                                          /s/ William F. Murphy
22                                          William F. Murphy (CSB No: 82482)
                                            wfm@dillinghammurphy.com
23                                          DILLINGHAM & MURPHY, LLP
                                            601 California Street, Suite, 1900
24                                          San Francisco, CA 94108
                                            (415) 397-2700
25                                          (415) 397-3300 (facsimile)

26                                          ATTORNEYS FOR PLAINTIFF KENTWOOL
                                            COMPANY

27

28                                                                                  19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2015, a true and correct copy of the foregoing was filed electronically and served by e-mail on anyone unable to accept electronic filing.  Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ William F. Murphy*
William F. Murphy

Plaintiff's Memorandum in Opposition to Defendant's 12(b)(6) Motion to Dismiss
14-CV-05264 JST