July 30, 3015

TO BE SUBMITTED VIA ECF WITH COURTESY COPY DELIVERY TO
CHAMBERS

Hon. Jon S. Tigar
U.S. District Court Judge
San Francisco Courthouse
Courtroom 9
19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

> *Re: Kentwool Company adv. NetSuite Inc. (*14-cv-05264-JST)
> *Joint Letter Brief Pursuant to September 17, 2013 Standing Order (Section F)*

Judge Tigar:

The parties in the above referenced matter, after meeting and conferring both in writing and by phone, present this joint letter brief regarding a dispute that has arisen concerning a single issue – Defendant NetSuite's ability to take an deposition of Plaintiff's President, Mark Kent.  NetSuite would characterize that deposition as an abbreviated deposition, while Kentwool characterizes it as a partial deposition.

We believe the issue is fairly straightforward, and thus we will keep this letter as brief as possible.

NetSuite's Position

As the Court will recall, the parties have a mediation scheduled with G. Daniel Bowling on August 19, 2015 in San Francisco.  In discussing this case both at a hearing on NetSuite's Motion to Dismiss and at the Case Management Conference held on May 20th, the parties discussed with the Court that participating in mediation would likely be beneficial.

In connection with discussions related to the mediation, and in order to avoid unnecessary costs, it was specifically agreed by the parties that *only "initial" and "essential" discovery would be taken prior to the mediation. See* Exhibit A, Updated

Joint Case Management Conference Statement [ECF 68], p.11:1-3 ("essential" discovery only and p. 12:5-6 ("initial discovery [] to allow for meaningful settlement discussions.")

In order to prepare for meaningful settlement discussions, NetSuite advised Kentwool it would like to take a short 3 ½ hour deposition of Kentwool's president, Mark Kent, who no one disputes is a key witness.  To avoid unnecessary costs and travel, NetSuite proposed to take such an abbreviated deposition on August 18th – when Mr. Kent is already going to be San Francisco.

As reflected further in Exhibit B, which documents the parties' efforts to meet and confer on this issue, NetSuite believes it has bent over backward to accommodate Kentwool's concerns.  Among other things, NetSuite has agreed to:

      1) Reduce the time of the deposition to 2.5 hours (down from the 3 to 3.5 hours previously suggested).

      2) Fully accommodate Mr. Kent and his counsel as to both the time and place of the deposition.  NetSuite agreed to take the late in the day on August 18[th.]  As Mr. Kent will be on east coast time, NetSuite also indicated willingness to scheduling the deposition early on the 19th.

      3) NetSuite agreed that in the event that the matter does not settle at mediation, if there was a need for a continued deposition of Mr. Kent, it would agree to take his deposition at his counsels' offices in South Carolina or at Mr. Kent's offices on a date and time that is mutually convenient and when another deposition is already scheduled.  That way there would be not be additional costs incurred by Kentwool.

The only objection that Kentwool's counsel has asserted is that it is not appropriate for NetSuite to take a short deposition in August and potentially have Mr. Kent subject to being reexamined at a later date.

NetSuite contends that this position fundamentally misunderstands the fact that the parties agreed – in writing – that only "limited" and "essential" discovery would take place prior to the mediation.  NetSuite believes that this agreement itself constitutes the good cause necessary for the court to allow NetSuite to take an abbreviated deposition of Mr. Kent now and a further deposition (taking into account the time used in this deposition) later if the case does not settle.  Demanding that NetSuite finish Mr. Kent's deposition prior to the mediation is directly contrary to the fact that all agreed that only limited discovery would be taken before the mediation.

Of course, it also makes no sense to have the parties spend significant costs associated with a potential 7 hour deposition (as opposed to a 2 ½ hour deposition) given the whole idea is to resolve the case in mediation.  Of course, insisting that NetSuite take

a longer deposition also would serve to further burden Mr. Kent and counsel – something NetSuite is trying to avoid.

For the foregoing reasons, and as the parties already agreed that only initial and essential discovery should take place prior to the mediation, Mr. Kent should be required to sit for an abbreviated 2 ½ hour deposition on August 17th *or* 18th and NetSuite should be allowed to depose him further at a later date if the case is not resolved -- this as the pre-mediation discovery was only intended to be on initial and essential issues.

Kentwool's Position

Succinctly stated, Kentwool has no objection to NetSuite taking a single, seven (7) hour, deposition of Mark Kent prior to the mediation scheduled in this case for August 19, 2015.  Kentwool does, however, object to NetSuite's efforts to get two (2) bites at the proverbial apple by taking multiple depositions of Mr. Kent under the guise of "avoid[ing] unnecessary costs and travel."

NetSuite's requested proposal is to have Mr. Kent, after traveling a *minimum* of 7 to 8 hours from South Carolina to California, sit for a deposition on August 18th only to have him potentially sit for another, subsequent deposition in the future if this case is not settled at mediation.  NetSuite contends that the purpose of such a deposition is to "get general and basic information for mediation purposes." (Ex. B, 7/28/2015, 6:00 PM E-mail from S. Gattey to C.Major.)  While Kentwool certainly appreciates NetSuite's desire to gain certain information prior to mediation, NetSuite has refused to explain what information regarding Kentwool's claims that NetSuite needs to adequately prepare for the mediation or why that unarticulated information could not be gleaned from the pleadings, from Kentwool's responses to NetSuite's Interrogatories, from Kentwool's responses to NetSuite's Requests for Admission, or the correspondence between the parties.

In order to alleviate NetSuite's purported concerns about obtaining basic information for mediation purposes, Kentwool presented the following alternatives:

1.   Kentwool offered to check Mr. Kent's availability to determine if he was able to travel on the 17th, sit for a complete and full deposition on the 18th and attend the mediation on the 19th.  NetSuite refused.  It must also be noted that, before the instant dispute arose, the parties specifically discussed the deposition of Mr. Kent and held open July 9, 2015 for his deposition.  At that point in time there was no mention of a partial deposition of Mr. Kent.  Despite the hold placed on July 9th, NetSuite never noticed Mr. Kent's deposition and the subject of his deposition was not resurrected until July 28th.

2.      Kentwool offered to respond to any requests for information NetSuite felt
was necessary in order for it to prepare for the mediation that Kentwool's
Complaint, Reply, and written discovery responses did not already
provide.  NetSuite refused.

Why NetSuite would refuse a complete and full deposition of Mr. Kent the day
before mediation only highlights NetSuite's true intent – to attempt to gain a tactical
advantage by the possibility of deposing Mr. Kent a second time.

NetSuite's contention that the partial deposition of Mr. Kent is to "avoid
unnecessary costs and travel" is counterintuitive.  To have counsel and Mr. Kent prepare
for two (2) short depositions is far more costly than having to prepare for a single
deposition.  Furthermore, in the event a second deposition were to occur, further travel
expense would be incurred.

Lastly, while Kentwool acknowledges that the Updated Joint Case Management
Conference Statement provides that limited discovery be conducted prior to mediation, it
in no way contemplates or authorizes the practice of partial depositions.  If NetSuite
would like to take the deposition of Mr. Kent, it should take his complete and full
deposition.  To the extent any topics go unaddressed in Mr. Kent's deposition, NetSuite
will have the ability to go into those topics with other witnesses, just as it would in any
other case. The parties' agreement to perform limited discovery prior to mediation does
not bestow any unique discovery options not previously made available through the
Federal Rules of Civil Procedure.

NetSuite's claim that a standard deposition would somehow be in conflict with
the Updated Joint Case Management Conference Statement is contradicted by NetSuite's
previous request, which Kentwool honored, to hold the date of July 9 for a deposition of
Mr. Kent.  There was absolutely no discussion of a "partial" or "limited" deposition of
Mr. Kent at that time, and there is no basis for arguing that the Updated Joint Case
Management Conference Statement requires such a partial deposition.

For the foregoing reasons, Mr. Kent should not be required to sit for a partial
deposition.  Instead, his deposition should be held in a single session, no longer than
seven (7) hours, and pursuant to the Federal Rules of Civil Procedure.

**Respectfully Submitted.**

Sincerely,                                                  Sincerely,

/s/                                                        /s/

Scott D. Gattey                                            Christopher B. Major
Counsel for Defendant NetSuite                             Counsel for Plaintiff Kentwool
                                                           *(Pro Hac Vice)*

4

Attachments (2)



# Exhibit A

1  HAYNSWORTH, SINKLER, BOYD P.A.
2  CHRISTOPHER B.MAJOR, ESQ. (Pro Hac Vice)
   BONNIE A. LYNCH, ESQ. (Pro Hac Vice).
3  One North Main, 2nd Floor
   Greenville, SC 29601-2119
4  Telephone:   864-240-3200
   Facsimile:    864-240-3300
5
   DILLINGHAM & MURPHY, LLP
6  WILLIAM F. MURPHY, ESQ. (SBN 82482)
   TAYLOR F. FORD, ESQ. (SBN 297014)
7  601 California Street, Suite 1900
   San Francisco, California 94108
8  Telephone:   (415) 397-2700
   Facsimile:    (415) 397-3300
9
   Attorneys for Plaintiff
10 KENTWOOL COMPANY
11 GATTEY LAW OFFICE
   SCOTT D. GATTEY, ESQ. (SBN 180875)
12 1001 Laurel Street, Suite C
   San Carlos, CA 94070
13 Telephone:   650-596-7123
   Facsimile:    877-269-4437
14
                    UNITED STATES DISTRICT COURT
15
                  NOTHERN DISTRICT OF CALIFORNIA
16
17 KENTWOOL COMPANY,                      Case No. 14-cv-05264-JST
18          Plaintiff,
                                          **UPDATED JOINT CASE
19     v.                                 MANAGEMENT CONFERENCE
                                          STATEMENT**
20 NETSUITE INC.,
                                          Date:  May 20, 2015
21          Defendants.                   Time: 2 P.M.
                                          Judge: Hon. Jon S. Tigar
22                                        Courtroom: 9

23        Pursuant to the Court's April 17, 2015 Order Continuing Case Management

24 Conference (Docket # 61), Plaintiff KENTWOOL COMPANY ("Kentwool" or

25 "Plaintiff") and defendant NETSUITE INC. ("NetSuite" or "Defendant") submit the

26 following Updated Joint Case Management Conference Statement.

27 //

28 //

**1. Jurisdiction and Service**.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) [diversity of citizenship]. Plaintiff Kentwool is a South Carolina corporation with its principal place of business in Greenville County, South Carolina (Amended Complaint, ¶ 1). Defendant NetSuite is a Delaware corporation with its principal place of business in San Mateo County, California (Amended Complaint ¶ 2). 28 U.S.C. § 1332(c)(1)[establishing the citizenship of corporations for diversity purposes]. The amount in controversy exceeds $75,000.00 exclusive of interest and costs. See, e.g., Amended Complaint ¶¶ 40 & 45. There is no dispute or issue between the parties as to the Court's subject matter jurisdiction. Defendant NetSuite has appeared in the action, and the parties are unaware of any issues regarding service of process on NetSuite. No parties remain unserved.

**2. Facts**.

(a) Plaintiff Kentwool.

The following is Kentwool's recitation of facts, which NetSuite specifically disputes.

Plaintiff Kentwool is a textile company headquartered in Greenville, South Carolina. It operates a state-of-the-art wool-based yarn spinning plant in Pickens, South Carolina serving a diversified international customer base. Defendant NetSuite is a software company that, according to its website, claims to offer "[t]he #1 Cloud Business Management Software Suite," including a proven Enterprise Resource Planning ("ERP") software solution that claims to be the "world's most deployed cloud ERP solution."

As detailed more fully in the Amended Complaint, through a series of material factual misrepresentations on which Plaintiff Kentwool reasonably relied, Defendant NetSuite induced Kentwool to enter into a Subscription Services Agreement ("Agreement") which required NetSuite to sell, customize, configure, and, implement its ERP software for Kentwool's specific needs and uses ("Software").

However, at the same time NetSuite was representing to Kentwool that NetSuite's Software could integrate the management of Kentwool's manufacturing, inventory, purchasing,

1  financial, sales and shipping processes into a single platform, NetSuite knew that, in fact, the

2  Software lacked the functionality to perform as represented.  This is not a matter of speculation:

3  to cite just one instance, during a telephone call regarding the problems with the

4  implementation process in late October 2013 or early November 2013, Rob Dahlager, the

5  NetSuite project manager for the Kentwool implementation, informed Cecelia Colangelo of

6  Kentwool that after a February 26, 2013 meeting at Kentwool's South Carolina facilities where

7  NetSuite represented the Software's supposed "capabilities" to Kentwool in an effort to induce

8  Kentwool to choose NetSuite's Software, he expressed doubt to his colleagues at NetSuite that

9  NetSuite could deliver on the promises made to Kentwool.  Particularly, Mr. Dahlager told

10  Cecelia Colangelo that he remarked to his NetSuite colleagues something to the effect of,

11  "How are we going to do this guys?  The software does not function like that."  In response, his

12  NetSuite colleagues stated that they would "figure it out."  NetSuite was unable to "figure it

13  out" and, as a result, the Software did not function as represented to Kentwool.

14       Defendant NetSuite's configuration and implementation of the Software for Kentwool

15  was riddled with problems such that NetSuite failed to achieve complete implementation of the

16  Software.  The Software failed, and continues to fail, to operate as originally represented by

17  NetSuite.  For instance, and among other problems, the Software has never been able to provide

18  visibility and management of the build and completion of finished products, including products

19  with multiple raw materials blended to produce a final product.  Furthermore, order approvals,

20  an integral part of the purchase order and procurement functions of the Software, were easily

21  thwarted by simply entering transactions for a low dollar amount and then amending the order

22  to amounts in excess of the approval limits selected by Kentwool.

23       Relying on NetSuite's assurances that it could, and would, correct the problems in the

24  configuration and implementation of the Software, Kentwool continued to pay for consulting

25  services and technical support from NetSuite to address the deficiencies.  Ultimately, Kentwool

26  paid NetSuite $317,851.26, which was well in excess of the original estimate of $245,784.65

27  provided to Kentwool.   What Plaintiff Kentwool received in exchange for its hundreds of

28  thousands of dollars was:  nothing.

In December 2013, Mark Kent, President of Kentwool, wrote to Rob Dahlager of NetSuite noting the problems with the Software, expressing doubt about NetSuite's ability to perform, and demanding adequate assurances that NetSuite would deliver a functional ERP product per its contractual obligation. Instead of providing adequate assurances, NetSuite submitted a revised Statement of Work for the project with a proposed *additional* cost to Kentwool of $215,912.00, and requested an additional implementation period until May 2014, which would be several months after the expiration of the original one year term of the Agreement.

(b) Defendant NetSuite

The following is NetSuite's recitation of facts, which Kentwool specifically disputes.

NetSuite, based in San Mateo, California, is an industry leading technology company that successfully provides thousands of customers with web-based business management solutions. NetSuite places a strong emphasis throughout its organization on customer service and has an excellent reputation among its customers. In addition to providing its business management solution, NetSuite also offers professional services to help customers in configuring NetSuite's standard offering to their particular needs.

In March 2013, NetSuite and Kentwool signed a Subscription Services Agreement and related documents (herein "the Agreements"). See First Amended Complaint ("FAC") ¶¶ 8-9. The Agreements executed by the parties -- both sophisticated business entities -- were fully integrated, and specifically limited NetSuite's obligations and Kentwool's rights.

The Agreements executed by the parties very clearly disclaimed *both* warranties of merchantability and fitness for a particular purpose. FAC, Exhibit A, Section 4; FAC, Exhibit B, Section 7.2 (Subscription Services Agreement); FAC, Exhibit B, Section 4.2 (Professional Services Addendum. NetSuite's various disclaimers state:

7.2 **Disclaimer of Warranties.** EXCEPT FOR THE WARRANTIES STATED IN THE TERMS OF SERVICE, NETSUITE DOES NOT REPRESENT THAT CUSTOMER'S USE OF THE SERVICE WILL BE SECURE, TIMELY, UNINTERRUPTED OR ERROR-FREE OR THAT THE SERVICE WILL MEET CUSTOMER'S REQUIREMENTS OR THAT ALL ERRORS IN THE SERVICE AND/OR DOCUMENTATION WILL BE CORRECTED OR THAT

THE OVERALL SYSTEM THAT MAKES THE SERVICE AVAILABLE
(INCLUDING BUT NOT LIMITED TO THE INTERNET, OTHER
TRANSMISSION NETWORKS, AND CUSTOMER'S LOCAL NETWORK
AND EQUIPMENT) WILL BE FREE OF VIRUSES OR OTHER HARMFUL
COMPONENTS THE WARRANTIES STATED IN TERMS OF SERVICE ARE
THE SOLE AND EXCLUSIVE WARRANTIES OFFERED BY NETSUITE.
THERE ARE NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR
IMPLIED, INCLUDING WITHOUT LIMITATION, THOSE OF
MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A
PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY
RIGHTS EXCEPT AS STATED IN SECTIONS 2.7, 3.1, AND 3.2 IN THE
TERMS OF SERVICE.  THE SERVICE IS PROVIDED TO CUSTOMER ON
AN "AS IS" AND "AS AVAILABLE" BASIS, AND IS FOR COMMERCIAL
USE ONLY.  CUSTOMER ASSUMES ALL RESPONSIBILITY FOR
DETERMINING WHETHER THE SERVICE OR THE INFORMATION
GENERATED THEREBY IS ACCURATE OR SUFFICIENT FOR
CUSTOMER'S PURPOSES.

FAC, Exhibit B (Subscription Services Agreement).

**4.2 Disclaimer.** THE WARRANTIES STATED IN SECTION 4.1 ABOVE ARE
THE SOLE WARRANTIES AND REMEDIES FOR CUSTOMER AND
EXCLUSIVE OBLIGATIONS OF NETSUITE RELATED TO THE
PROFESSIONAL SERVICES AND DELIVERABLES TO BE PERFORMED
FOR AND DELIVERED TO CUSTOMER PURSUANT TO THIS
ADDENDUM AND ANY STATEMENT OF WORK.  THERE ARE NO
OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED,
INCLUDING WITHOUT LIMITATION, THOSE OF MERCHANTABILITY,
FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY,
TITLE AND NON-INFRINGEMENT EXCEPT AS PROVIDED HEREIN.  THE
PROFESSIONAL SERVICES AND DELIVERABLES PROVIDED TO
CUSTOMER ARE ON AN "AS IS" AND "AS AVAILABLE" BASIS.

FAC, Exhibit B (Professional Services Addendum)

**4. Disclaimer of Warranties.** EXCEPT AS STATED IN SECTION 3 ABOVE,
NETSUITE DOES NOT REPRESENT THAT CUSTOMER'S USE OF THE
SERVICE WILL BE SECURE, TIMELY, UNINTERRUPTED OR ERROR-
FREE OR THAT THE SERVICE WILL MEET CUSTOMER'S
REQUIREMENTS OR THAT ALL ERRORS IN THE SERVICE AND/OR
DOCUMENTATION WILL BE CORRECTED OR THAT THE OVERALL
SYSTEM THAT MAKES THE SERVICE AVAILABLE (INCLUDING BUT
NOT LIMITED TO THE INTERNET, OTHER TRANSMISSION NETWORKS,
AND CUSTOMER'S LOCAL NETWORK AND EQUIPMENT) WILL BE
FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. THE
WARRANTIES STATED IN SECTION 3 ABOVE ARE THE SOLE AND
EXCLUSIVE WARRANTIES OFFERED BY NETSUITE. THERE ARE NO
OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED,

> INCLUDING WITHOUT LIMITATION, THOSE OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS. EXCEPT AS STATED IN SECTIONS 2.7, 3.1, AND 3.2 ABOVE, THE SERVICE IS PROVIDED TO CUSTOMER ON AN "AS IS" AND "AS AVAILABLE" BASIS, AND IS FOR COMMERCIAL USE ONLY. CUSTOMER ASSUMES ALL RESPONSIBILITY FOR DETERMINING WHETHER THE SERVICE OR THE INFORMATION GENERATED THEREBY IS ACCURATE OR SUFFICIENT FOR CUSTOMER'S PURPOSES

FAC, Exhibit A (Terms of Service).

It was not as if NetSuite sought to hide its disclaimer of these warranties from Kentwool. They appear in no fewer than three (3) separate places in the parties' Agreements, and Plaintiff's Chief Executive Officer, Mark Kent, immediately above his signature, agreed as follows:

> THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ THIS AGREEMENT, UNDERSTAND IT AND AGREE TO BE BOUND BY ITS TERMS, AND THE PERSON SIGNING ON BEHALF OF EACH HAS BEEN AUTHORIZED TO DO SO. IF THE PERSON SIGNING BELOW AS CUSTOMER IS ENTERING INTO THIS AGREEMENT ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, SUCH PERSON REPRESENTS THAT HE OR SHE HAS THE AUTHORITY TO BIND SUCH ENTITY AND ITS AFFILIATES TO THESE TERMS AND CONDITIONS.

FAC, Exhibit B (Subscription Services Agreement).

Further, the parties' Agreements could not be clearer that they were fully integrated, providing as follows:

> This Agreement, including all exhibits and/or Estimate/Order Forms, shall constitute the entire understanding between Customer and NetSuite and is intended to be the final and entire expression of their agreement. The parties expressly disclaim any reliance on any and all prior discussions, emails, RFP's and/or agreements between the parties. There are no other verbal agreements, representations, Warranties, undertakings or other agreements between the parties. Under no circumstances will the terms, conditions or provisions of any purchase order, invoice or other administrative document issued by Customer in connection to this Agreement be deemed to modify, alter or expand the rights, duties or obligations of the parties under, or otherwise modify, this Agreement, regardless of any failure of NetSuite to object to such terms, provisions, or conditions. The Agreement shall not be modified or amended, except as expressly set forth herein, or in writing and signed or accepted electronically by the party against whom the modification, amendment or waiver is to be asserted, or by a properly executed Estimate/Order Form.

FAC, Exhibit B (Subscription Services Agreement), Section 9, p. 3.

> **11. Entire Addendum.**  The parties acknowledge that they have had previous discussions related to the performance by NetSuite of Professional Services for Customer and the possible strategies which may be used by NetSuite to implement the Service to achieve the requirements identified by Customer.  This Addendum, together with the attached exhibits that are incorporated by reference, and the Agreement, constitute the complete agreement between the parties and supersede all prior or contemporaneous agreements or representations, written or oral, concerning the subject matter of this Addendum and such exhibits.  The parties expressly disclaim any reliance on any and all prior agreements, understandings, RFPs, verbal and/or written communications related to the Professional Services to be provided by NetSuite.  No other act, document, usage or custom shall be deemed to amend or modify this Addendum unless agreed to in writing signed by a duly authorized representative of both parties.  In the event of any conflict between the terms of this Addendum and the terms of the Agreement, this Addendum shall control.

FAC, Exhibit B (Professional Services Addendum), p.7, Section 11.

Having had the full opportunity to review its technology needs and the Agreements identifying with specifity exactly what it would receive from NetSuite, it is NetSuite's position that Kentwool cannot now take the position that it justifiably relied on a few alleged limited and general statements purportedly made during the pre-sales process by NetSuite.  NetSuite suggests that Kentwool essentially wants to get out of a bargain it made – not because of any breach by NetSuite, but because it simply didn't understand its own business needs when it signed up to purchase a solution and services from NetSuite.

Importantly, the parties' Agreements provided that Kentwool had the obligation to notify NetSuite if Kentwool contended that there had been a material breach of the parties' Agreements.  FAC, Ex. B, Sections 4.5 & 6 (Subscription Services Agreement). This never occurred.  Thus, even assuming NetSuite had breached the limited warranty, Kentwool never provided NetSuite the opportunity to address its concerns.

This is a simple case.  Kentwool and NetSuite – both sophisticated parties – negotiated a fully integrated Agreements carefully laying out their respective obligations to each other.  This applicable Agreements were executed by Kentwool's owner and highest-ranking

executive, Mark Kent.  Kentwool now wants out of the Agreements, and is suggesting that it justifiably relied on a few isolated and very general statements allegedly made to it before it signed the Agreements which provided that there were no such prior agreements or representations upon which they were relying.

NetSuite seeks to recover its attorneys' fees and costs associated with defending itself against what it considers is a meritless lawsuit.  NetSuite may also seek to recover monies it contends it was owed by Kentwool but which have not been paid.

**3.  Legal Issues.**

(a)  **Attorneys' fees**:  During the February 12, 2015, hearing on Defendant NetSuite's motion to dismiss, the Court instructed the parties to include in their Joint Case Management Conference Statement the parties' positions as to the applicability to this dispute of the attorneys' fees clause contained in ¶ 9 of the Subscription Services Agreement.  The parties agree that the attorneys' fees clause in the Agreement is applicable to this action, and would provide the prevailing party with an award of its attorneys' fees and costs.

(b)  **Kentwool's Claims**:  Kentwool's Amended Complaint currently asserts claims for Breach of Contract [First Claim for Relief], Breach of Express Warranty [Second Claim for Relief], Fraud/Misrepresentation [Third Claim for Relief], Negligent Misrepresentation [Fourth Claim for Relief], Unfair Competition in Violation of California Business & Professions Code § 17200 et seq. [Fifth Claim for Relief], Violations of South Carolina's Unfair Trade Practices Act [Sixth Claim for Relief], Fraud in the Inducement [Seventh Claim for Relief], Rescission [Eighth Claim for Relief], and Restitution [Ninth Claim for Relief].

(c)  **Fully Integrated Agreement**:  NetSuite contends that all of Kentwool's claims, with the exception of its claim for breach of contract, are improper as, among other reasons, the parties entered a fully integrated agreement and Kentwool is seeking to rely on inadmissible parol evidence.  NetSuite intends to seek to file a dispositive motion to significantly streamline Kentwool's claims.

(d)     **Justifiable Reliance**: NetSuite contends that after discovery it will be able to establish that Kentwool's reliance on the alleged statements upon which most of Kentwool's claims are based was not justifiable, and thus that its claims based on such statements must be dismissed with prejudice.

(e)     **Limited Warranties/Limitation of Damages:**      NetSuite contends that the parties' fully integrated contract limits the warranties and damages at issue.  NetSuite contends that Kentwool is bound by the terms of this contract, and thus that its claims for additional warranties and damages must be dismissed with prejudice.

### 4.  Motions

This action was initially commenced in the South Carolina Court of Common Pleas for Greenville County.  Kentwool v. NetSuite, C/A No.: 2014-CP-23-02909.  On July 1, 2014, NetSuite removed the action based on diversity jurisdiction to the United States District Court for the District of South Carolina, and subsequently filed a Motion to Transfer the action to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404a.  Kentwool v. NetSuite, C/A No.: 3:14-CV-05264-JST.  The U.S. District Court for the District of South Carolina found venue to be appropriate in this Court and, by Order dated December 1, 2014, this action was transferred to the United States District Court for the Northern District of California where it is currently pending.  After the action was transferred to this Court, Defendant NetSuite filed a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  By an order dated February 18, 2015, the Court granted in part, and denied in part, NetSuite's motion to dismiss.  Plaintiff Kentwool filed an Amended Complaint on March 20, 2015.  NetSuite will be responding to this First Amended Complaint by April 10, 2015.

### 5.  Amendment of Pleadings.

The Court's February 18, 2015 Order granted Defendant NetSuite's motion to dismiss Plaintiff Kentwool's claims for breach of an implied warranty of merchantability and breach of an implied warranty of fitness for a particular purpose with prejudice.  Plaintiff Kentwool intends, during discovery, to develop a factual record supporting the applicability of the

Uniform Commercial Code to its claims, and based on that record, intends to move the Court for leave to re-assert those claims. NetSuite disputes that Kentwool should be entitled to so amend its pleadings.

**6. Evidence Preservation.**

The parties have issued "litigation hold" communications to representatives within their clients to preserve electronic and documentary evidence relevant to this dispute.

**7. ESI Guidelines, Rule 26(f) Conference.**

The parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"), and confirm that they have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action.

8. **Disclosures**.

The parties have made initial disclosures as required by Fed. R. Civ. P. 26. In its Initial and Amended Initial Disclosures, Plaintiff Kentwool identified some 25 witnesses with knowledge relevant to its claims in this action, and produced some 234 documents supporting its claims for damages. Defendant NetSuite's Initial Disclosures identified many of the same witnesses identified by Plaintiff Kentwool, and 8 additional persons. NetSuite is currently reviewing the documents produced by Kentwool to determine whether Kentwool has in fact provided documents supporting its claimed damages. NetSuite reserves the right to require that Kentwool disclose additional documents related to its claimed damages if its review reveals that such further documents should be produced.

9. **Discovery**.

To date, there has been no discovery conducted other than the discovery provided by the parties' Initial Disclosures. At the request of NetSuite, Kentwool supplemented its Initial Disclosure Statement. NetSuite has also agreed to supplement its Initial Disclosure Statement. The parties do not currently believe that any limitations or modifications of the discovery rules are warranted or required in this action. In the parties' Rule 26(f) conference, discovery plans were discussed, but neither party believes a formal discovery plan is needed at this point in the

action. However, the parties are actively discussing with each other what essential discovery each party believes it needs prior to the mediation of this action, as well as the timing and other aspects of such discovery. Kentwool is aware of other past litigation involving NetSuite and its alleged failure to provide software solutions as promised, and plans to take discovery and to conduct investigation to determine whether those cases may provide information relevant to this action. NetSuite contends that previous litigation involving separate parties and issues are not relevant – especially for a company that has thousands of customers and employees. NetSuite expects to oppose attempts by Kentwool to delve into issues that are in no way related to the facts of this case.

10. **Class Actions**.

Not applicable.

11. **Related Cases**.

The parties are unaware of any related cases pending between Kentwool and NetSuite.

**12. Relief.**

Kentwool seeks full restitution of all funds it paid to Defendant or to third parties in reliance on Defendant's promises and representations plus prejudgment interest and its attorneys' fees. The principal amount paid to NetSuite is $317,851.26. This amount was computed based upon the invoices received from NetSuite. Kentwool contends it has provided NetSuite with its copies of the NetSuite invoices, as well as other invoices reflecting and supporting its claims for damages. The parties' attorney's fees claim cannot be computed until the case is resolved. Discovery and investigation are also continuing as to any further consequential damages allegedly suffered by Kentwool as a result of Defendant's alleged wrongful actions, such as cover costs incurred by Plaintiff in carrying on the functions that were to be performed by Defendant's ERP software. To date, Kentwool has expended $336,842.07 to implement a replacement software product.

NetSuite contends that Kentwool is not entitled to recover the damages it is seeking, and the damages to which it is entitled are clearly limited pursuant to the fully executed contract its CEO executed. NetSuite expects to seek to limit the induction of any evidence other than as provided for in the fully integrated contract.

**13. Settlement and ADR**

Both parties are prepared to discuss resolution of Kentwool's claims at any time. Kentwool believes the parties are sufficiently familiar with the case to engage in meaningful settlement discussions now. NetSuite believes some initial discovery must be conducted to allow for meaningful settlement discussions. Defendant NetSuite's Initial Disclosures mentioned that an insurance carrier is involved. On May 6, 2015, the Court's ADR Program appointed Daniel Bowling as the mediator in this case. No mediation date has been set. The current deadline under ADR Local Rule 6-4(b) is July 27, 2015 [90 days after entry of the order referring this case to mediation; order signed and entered by the Court April 27, 2015 – docket # 65].

**14. Consent to Magistrate Judge For All Purposes.**

Neither party consents to have a magistrate judge conduct all further proceedings including trial and entry of judgment

**15. Other References.**

The parties do not believe this case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**16. Narrowing of Issues.**

After some discovery, the parties will explore options to narrow issues or to expedite the presentation of evidence at trial, including by way of a dispositive motion. The parties are presently unaware of any need to bifurcate issues, claims or defenses.

**17. Expedited Trial Procedure**

The parties do not believe this action is suitable for handling under the Expedited Trial Procedure of General Order No. 64, Attachment A.

**18. Scheduling.**

The parties propose the following dates for designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference and trial:

*//*

LD to complete mediation:  July 27, 2015
Trial:  May 23, 2016.
Pre-Trial Conference:  May 12, 2016
Expert Witness Discovery Cutoff:  April 1, 2016
LD to designate supplemental experts:  February 19, 2016
LD to designate expert witnesses:  January 29, 2016
LD to file dispositive motion: February 15, 2016
Discovery Cutoff:  January 15, 2016

19. **Trial**.

Plaintiff has demanded a jury trial.  Expected length of trial:  4-5 days.

20. **Disclosure of Non-party Interested Entities or Persons**.

Both parties have filed their "Certification of Interested Entities or Persons" as required by Civil Local Rule 3-15. Plaintiff Kentwool restates the contents of its certification that at the present time there are no interested entities or persons other than the parties to this action. Defendant restates the contents of its certification that there are two parties who each hold more than a 10% interest in NetSuite Inc. and NetSuite has disclosed these parties as interested in the litigation.

**21. Professional Conduct**: All attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

**22. Other Matters**.

The parties are presently unaware of any other matters as may facilitate the just, speedy and inexpensive disposition of this matter.

Dated:  May 11, 2015                    DILLINGHAM & MURPHY, LLP
                                        WILLIAM F. MURPHY, ESQ.
                                        TAYLOR F. FORD, ESQ.


                                   By:  ___/s/ William F. Murphy_____
                                        Attorneys for KENTWOOL COMPANY


Dated:  May 11, 2015                    GATTEY LAW OFFICE
                                        SCOTT D. GATTEY, ESQ.


                                   By:  ___/s/ Scott D. Gattey_____
                                        Attorneys for NETSUITE INC.



Exhibit B

**From:** Scott Gattey <scott@gatteylaw.com>
**Subject: Re: Proposal for Scheduling Abbreviated Deposition of Mark Kent - Following Up on Meet and Confer Call**
**Date:** July 30, 2015 at 8:43:17 AM PDT
**To:** "Christopher B. Major" <cmajor@hsblawfirm.com>
**Cc:** "William F. Murphy" <WFM@dillinghammurphy.com>, "Lynch, Bonnie" <blynch@hsblawfirm.com>

Thank you for your e-mail.  I believe we have exhausted our meet and confer and should agree to disagree.

I will submit a letter later today so we can submit this issue to the Court.

Best,

Scott



**1001 Laurel Street, Suite C**
**San Carlos, CA 94070**
**650.596.7123 (direct)**
**877.269.4437 (fax)**
**www.gatteylaw.com**

On Jul 30, 2015, at 8:31 AM, Major, Chris <cmajor@hsblawfirm.com> wrote:

Scott,

Just to reiterate our discussion, it is for your convenience and tactical advantage that the request to take a partial deposition of Mr. Kent was made.  Your summary omits the fact that I have offered to make available the witness you requested for the entire day on the date you proposed (for the second time, since we previously were holding a

date in July for his deposition).  I also offered to respond to any requests for information you felt was necessary for you to prepare for the mediation.  You rejected these offers.

You still have not explained what information you need to meaningfully participate in the mediation that you do not have from the amended complaint, the written discovery responses, and the correspondence between the parties.  This background demonstrates that your goal is to have the tactical advantage of being able to have a second bite at the apple of deposing Mr. Kent if the mediation is not successful.

I attempted to accommodate your request despite the fact that it severely inconveniences my client.  First, any time spent preparing for the deposition will distract us from focusing on the mediation.  Second, Mr. Kent would be subjecting himself to a deposition immediately after traveling across the country.  Third, Mr. Kent is  a non-party resident of South Carolina who has no obligation to travel to California to be deposed as a fact witness.

You indicate that Mr. Kent's testimony is important to maximizing our chances of a successful mediation.  If that is the case, then lets schedule the deposition without the arbitrary constraints you have proposed.  You can take the full day or a shorter time as you see fit.  If you are concerned about failing to ask him something that you might be interested in later, then the obvious answer would be to include that as a topic in a PMK deposition of Kentwool.

If you insist in pursuing this unusual and unreasonable course, then send me the draft letter and I will add in the summary of our position.

Chris

**From:** Scott Gattey [mailto:scott@gatteylaw.com]  **Sent:** Wednesday, July 29, 2015 4:41 PM **To:** Major, Chris **Cc:** William F. Murphy; Lynch, Bonnie **Subject:** Proposal for Scheduling Abbreviated Deposition of Mark Kent - Following Up on Meet and Confer Call **Importance:** High

Chris:

Thanks for your time this morning.  I write to confirm the offer that NetSuite has made in order to try and accommodate Mr. Kent's schedule (and yours), to save money in the hopes that the case might be resolved, and to ensure that if a further deposition is needed, there is no prejudice to Mr. Kent or your office.

Specifically, I explained (and offered) the following:

1) We would agree to limit Mr. Kent's deposition to 2.5 hours (down from the 3 to 3.5 hours we previously suggested);

2) We are willing to fully accommodate both your schedule and that of Mr. Kent both as to time and place of the deposition.  We are agreeable to taking the deposition at Bill Murphy's office, at Mr. Kent's hotel, etc.  We are also willing to take the deposition late in the day on the 18th (so as not to push Mr. Kent to have to arrive in San Francisco early).  If you want to start at 6pm, fine.  We will fully accommodate Mr. Kent's schedule.  We would also be amenable to scheduling the deposition early on the 19th.  Even if we were to start at 7 a.m., that would be 10am East Coast time.  It would be me that would have to cope with being tired for an early deposition — not you or your client.

3) In the event that the matter does not settle at mediation, if there is a need for a continued deposition of Mr.

Kent, we will agree to take his deposition at either your offices in South Carolina or at Mr. Kent's offices on a date and time that is mutually convenient and when another deposition is already scheduled.  That way there would be not be additional costs incurred by your firm.

      4) I advised you that if you wanted to take the deposition of a NetSuite witness who is also going to be in town we would be happy to allow you to notice a 2 1/2 hour deposition of said witness and would allow you to continue that individual's deposition at a later date.

As I mentioned, our intention is to gather information from a key witness without spending a significant amount of money and time on a deposition — which money might better be used on potential resolution.  We are also mindful of your client's travel schedule and your own.  We frankly can envision *no prejudice whatsoever* to your client to his agreeing to sit for a deposition prior to the mediation — especially given all the commitments we have made to accommodate him.

For these reasons, we believe good cause exists to ask your client to agree to a 2 1/2 hour deposition while Mr. Kent is in town for the August 19th mediation.  We think your client would *want* to be able to explain the facts supporting Kentwool's case prior to the mediation.

I'd rather avoid the need to burden the court with this issue, but because we believe good cause does exist for the abbreviated deposition we have proposed, we will seek the Court's assistance if necessary.

You have agreed to let me know by 9am Pacific Time tomorrow morning (July 30th) whether your client will agree to sit for a short deposition as we have proposed.  If not, I will send you our letter to Judge Tiger (per Standing Order for Civil Cases (September 17, 2013), Section F), and you agreed to include your comments by the end of the day tomorrow so we can present the joint letter to the Court by the close of business tomorrow.

I look forward to hearing back from you *by 9am tomorrow* per our agreement.

Best,

Scott

**1001 Laurel Street, Suite C**
**San Carlos, CA 94070**
**650.596.7123 (direct)**
**877.269.4437 (fax)**
**www.gatteylaw.com**

On Jul 29, 2015, at 10:23 AM, Major, Chris <cmajor@hsblawfirm.com> wrote:

We can have the call either way.

**From:** Scott Gattey [mailto:scott@gatteylaw.com]  **Sent:** Wednesday, July 29, 2015 1:23 PM **To:** Major, Chris **Cc:** William F. Murphy; Lynch, Bonnie **Subject:** Re: Scheduling Short Deposition of Mark Kent on August 18th Prior to Mediation

Lets talk at 1pm.  Hopefully you don't need two attorneys to discuss this issue.  That said, I hope Bill can join.

Here is dial-in information for our conference call:          Conference Dial-in: (760) 569-7171          Participant Code: 436766609

Best,

Scott

**1001 Laurel Street, Suite C**
**San Carlos, CA 94070**
**650.596.7123 (direct)**
**877.269.4437 (fax)**
**www.gatteylaw.com**


On Jul 29, 2015, at 10:19 AM, Major, Chris <cmajor@hsblawfirm.com> wrote:

Scott,

I have already told you I am happy to try to arrange a standard deposition of Mr. Kent on the date you proposed if you want it, and you declined.  If you are not ready to depose him, then why are we discussing whether you want to ask Judge Tigar to order him to appear for some sort of preliminary deposition in a couple of weeks?  Asking for the right to conduct two stage discovery of fact witnesses is in no sense a cost savings proposal and is highly unusual.

If there is some information you feel you need to enable your client to participate fully in the mediation, then let me know what it is and I will endeavor to respond.  I can be available for a call at 4pm eastern.  I am not sure on Bill's availability, though.

Chris

**From:** Scott Gattey [mailto:scott@gatteylaw.com]  **Sent:** Wednesday, July 29, 2015 11:26 AM **To:** Major, Chris **Cc:** William F. Murphy; Lynch, Bonnie **Subject:** Re: Scheduling Short Deposition of Mark Kent on August 18th Prior to Mediation

I don't believe it necessary or appropriate to conduct a full day deposition when the goal was (I thought) trying to see if we could resolve this matter at mediation.

When can we meet and confer today on a call?

I want to make it clear we have met our obligations before submitting a joint letter brief.  You can argue your position and I will present mine.  Judge Tigar (or his designee) can decide.

Keep in mind that I am trying to both limit the inconvenience to your client *and* save money.  I also agreed that if the case does not settle, I would take Mr. Kent's deposition in South Carolina at a time that is mutually convenient for him and for you, and will do so on a day that you would already be present defending depositions, so there is no extra burden on either you or Mr. Kent.

I look forward to a time to discuss.

Best,

Scott

**1001 Laurel Street, Suite C**
**San Carlos, CA 94070**
**650.596.7123 (direct)**
**877.269.4437 (fax)**
**www.gatteylaw.com**

On Jul 29, 2015, at 8:17 AM, Major, Chris

<cmajor@hsblawfirm.com> wrote:

Scott,

You were asking to depose my client for several hours immediately after he finished traveling for 7-8 hours minimum across the country based upon the available flights from Greenville.  That in itself is highly unusual.  You also seem to be insisting on getting to conduct a two part deposition of a witness staggered over an undefined time period, which again is highly unusual.

I am willing to try to arrange for a full deposition that day with Mark and I travelling on Monday if you would like.  That would likely require us to reschedule our call with the Mediator on Monday, though.

Chris

**From:** Scott Gattey [mailto:scott@gatteylaw.com]  **Sent:** Wednesday, July 29, 2015 11:12 AM **To:** Major, Chris **Cc:** William F. Murphy; Lynch, Bonnie **Subject:** Re: Scheduling Short Deposition of Mark Kent on August 18th Prior to Mediation **Importance:** High

Chris:

I do not consider the request in any way "highly unusual" when the idea is to avoid unnecessary expense, and to try and obtain facts so we might have a better chance to resolve the matter.  And to be clear, I'm not asking Mr. Kent to travel - he is going to be here and I asked for approximately 3.5 hours.

I suggest we meet and confer on this issue later today and then if we are unable to resolve it present it Judge Tigar (or a Magistrate he designates) in a joint letter brief today or tomorrow per his local rule related to discovery disputes.  Standing Order for Civil Cases

(September 17, 2013), Section F.

*Please let me know a time today you are available to discuss.*

Best,

Scott
**1001 Laurel Street, Suite C**
**San Carlos, CA 94070**
**650.596.7123 (direct)**
**877.269.4437 (fax)**
**www.gatteylaw.com**

On Jul 29, 2015, at 7:44 AM, Major, Chris
<cmajor@hsblawfirm.com> wrote:

Scott,

The unnecessary cost would be from multiplying depositions of individual deponents.  You are asking a witness to travel across the country and then immediately subject himself to a deposition, and then further expect to be able to depose him again at a later date at your convenience.  This is a highly unusual request.

Because Mark will be in California, I am happy to talk to Mark about whether his schedule will allow him to travel in time to sit for a deposition on the day before mediation.  However, if we convene any deposition in this case, then we need to do so at a time and in a manner where we can complete it in one day.  Let me know if you would like me to talk to Mark about whether he can get there in time to start earlier in the day on Tuesday so that you can complete your anticipated questions and conclude his deposition.

Chris

**From:** Scott Gattey [mailto:scott@gatteylaw.com]  **Sent:** Tuesday, July 28, 2015 6:31 PM **To:** Major, Chris **Cc:** William F. Murphy; Lynch, Bonnie **Subject:** Re: Scheduling Short Deposition of Mark Kent on August 18th Prior to Mediation

Your position is disappointing, and appears intended to simply unnecessarily drive up the cost of the litigation when I was trying to be both mindful of costs and your client's schedule

I could easily accommodate Mr. Kent's schedule some other time when in South Carolina, so I see no prejudice whatsoever.

Please reconsider and advise.  Obviously we cannot force Mr. Kent to sit for deposition, but our ability (and that of NetSuite's carrier) to consider settlement is likely to be impacted by your decision.  I expect the mediator would also be somewhat surprised that Mr. Kent was in town and unwilling to sit for a short deposition taken to try and move the parties toward settlement.

Best,

Scott
 **1001 Laurel Street, Suite C**
**San Carlos, CA 94070**
**650.596.7123 (direct)**
**877.269.4437 (fax)**
**www.gatteylaw.com**


On Jul 28, 2015, at 3:25 PM, Major, Chris <cmajor@hsblawfirm.com> wrote:

Scott,

I appreciate your desire to settle, but I am concerned about going forward if the mediation is not successful and Mr. Kent would

potentially have to sit for multiple depositions.  It would be inefficient for my client to have to pay me to prepare for and defend multiple depositions of the same witness.  We need to schedule his deposition so we can conclude it in a day.

Chris

**From:** Scott Gattey [mailto:scott@gatteylaw.com]  **Sent:** Tuesday, July 28, 2015 6:00 PM **To:** Major, Chris **Cc:** William F. Murphy; Lynch, Bonnie **Subject:** Re: Scheduling Short Deposition of Mark Kent on August 18th Prior to Mediation

I was not planning on it.  I was going to notice it for 1:00pm or so and go until approximately 4:30 or 5 pm.

If there were a need to continue his deposition, I would do so in South Carolina.  Real goal here is to get general and basic information for mediation purposes.  Doesn't make sense in my mind (and hopefully Mr. Kent's as well) to take a lengthy deposition if both parties are hopeful that with the mediators help they might be able to resolve the matter amicably.

Best,

Scott

**1001 Laurel Street, Suite C**
**San Carlos, CA 94070**
**650.596.7123 (direct)**
**877.269.4437 (fax)**
**www.gatteylaw.com**

On Jul 28, 2015, at 2:43 PM, Major, Chris <cmajor@hsblawfirm.com> wrote:

Scott,

You would be concluding the deposition that day, correct?

Chris

**From:** Scott Gattey [mailto:scott@gatteylaw.com]  **Sent:** Tuesday, July 28, 2015 11:27 AM **To:** William F. Murphy **Cc:** Lynch, Bonnie; Major, Chris **Subject:** Scheduling Short Deposition of Mark Kent on August 18th Prior to Mediation

Counsel:

I assume that Mr. Kent will be attending the mediation on August 19th in San Francisco.  I'd like to schedule a short deposition on August 18th (no more than 3.5 hours).  I am of course happy to accommodate his travel schedule on the 18th - happy to start in the afternoon.

Please let me know Mr. Kent's availability for a short deposition on the 18th.

Best,

Scott

**1001 Laurel Street, Suite C**
**San Carlos, CA 94070**
**650.596.7123 (direct)**
**877.269.4437 (fax)**
**www.gatteylaw.com**